## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
IN RE:                        :
                              :
MICHAEL S. GOLDBERG, LLC, and :
MICHAEL S. GOLDBERG,          :    Civil No. 3:15-cv-1687(AWT)
                              :
         Debtors.             :
------------------------------:
JAMES BERMAN, CHAPTER 7 TRUSTEE:
FOR THE SUBSTANTIVELY          :    Adv. Pro. No. 14-02026(AWT)
CONSOLIDATED ESTATE OF         :
MICHAEL S. GOLDBERG, LLC, AND  :
MICHAEL S. GOLDBERG,           :
                              :
         Plaintiff,           :
                              :
v.                            :
                              :
SALLY A. LABONTE, TRUSTEE OF  :
THE SCOTT A. LABONTE DYNASTY  :
TRUST, ET AL.,                :
                              :
         Defendants.          :
                              :
------------------------------ x
```

### RULING ON MOTION TO COMPEL
### AND MOTIONS TO QUASH SUBPOENAS

James Berman, the Chapter 7 Trustee (the "Trustee") for the substantively consolidated bankruptcy estate of Michael S. Goldberg, LLC and Michael S. Goldberg (collectively, the "Debtors"), has filed a motion seeking an order compelling third-parties Cummings & Lockwood LLC ("C&L"), Charter Oak Law, P.C., as successor to Levy and Droney PC ("Charter Oak"), and CohnReznick LLP ("CohnReznick," collectively, the "Professional Firms") to fully comply with the Trustee's subpoenas <u>duces</u>

1

tecum served on each of the Professional Firms, and the defendants in this action and the Professional Firms have filed motions to quash those subpoenas duces tecum.  For the reasons set forth below, the motion to compel is being granted and the motions to quash are being denied.

## I.   Factual and Procedural Background

From the mid-1990s to October 2009, the Debtors operated a pure Ponzi scheme (the "Goldberg Scheme").  Scott A. LaBonte ("Scott LaBonte") was an investor in the Goldberg Scheme.  He was also a "feeder" to the Goldberg Scheme in that he sought other people's money to fund his own investments; this magnified and spread the harm to the creditor-victims of the Estate by furthering and enlarging the Goldberg Scheme.  Because Scott LaBonte knew the Goldberg Scheme was a fraud, he structured his own investments in the Goldberg Scheme, as well as those of individuals he introduced to the Goldberg Scheme, as loans memorialized by promissory notes issued to his cousin Edward Malley (the "Malley Notes").  The Malley Notes included hundreds of thousands of dollars of up-front "loan fees" payable to Scott LaBonte and expressly required that Edward Malley ("Malley") use the funds received from Scott LaBonte to invest with Goldberg. Also, they had usurious rates of interest.  Both CohnReznick and Charter Oak advised on and assisted in drafting the Malley Notes, including the use of Nevada law to avoid Connecticut's

2

usury laws. The structure of Scott LaBonte's investments in the Goldberg Scheme evidenced his fraudulent intent.

In November 2009, at a time when Goldberg was having difficulty raising the funds necessary to pay off earlier investors, many of whom were pressuring him for payment, and the number of new investments was dwindling, Goldberg voluntarily turned himself in to the Federal Bureau of Investigation.  Scott LaBonte learned in November 2009 that Goldberg had turned himself in to law enforcement authorities and had admitted to running a Ponzi scheme.

Scott LaBonte is the settlor of the Scott A. LaBonte Revocable Trust (the "Revocable Trust"), which was settled in the 1990's.  Scott LaBonte is also the settlor of the SAL Dynasty Trust, which was settled in 2006.  The beneficiaries of the SAL Dynasty Trust are Sally LaBonte and the children of Scott and Sally LaBonte.

From the inception of the SAL Dynasty Trust through October 2013, the named trustees were Joseph Sparveri ("Sparveri"), Roland LaBonte and Sally LaBonte.  Sally LaBonte is Scott LaBonte's wife.  Roland LaBonte is Scott LaBonte's father. Sparveri is an accountant who, as of 2006, had served as Scott LaBonte's personal accountant for more than 15 years; he had also served as the accountant for other LaBonte family members (including Scott LaBonte's father) and for businesses in which

3

Scott LaBonte held an ownership interest.  Thus, Scott LaBonte was neither a beneficiary nor a trustee of the SAL Dynasty Trust.

Even though the LaBonte's home was not owned by the SAL Dynasty Trust, Sally LaBonte testified that her responsibilities as a trustee of the SAL Dynasty Trust were to take care of her home and to make sure household and family bills were paid. Sally LaBonte's testimony was, in effect, that she was not involved in the management of any of the assets of the SAL Dynasty Trust, was not familiar with the amount of income generated by the entities in which the SAL Dynasty Trust owned an interest, and was not involved in decisions related to the movement of funds by the SAL Dynasty Trust by and between entities in which it owned an interest.  The second trustee, Roland LaBonte, did not make any decisions or take any action on behalf of the SAL Dynasty Trust.  The third trustee, Sparveri, signed only a few, i.e., five or six, SAL Dynasty Trust checks. Sparveri testified he had two duties as a trustee of the SAL Dynasty Trust, investment of the trust assets and accounting. However, he also testified that neither he nor the other two trustees found investment opportunities for the SAL Dynasty Trust. The SAL Dynasty Trust had a line of credit with the Revocable Trust, and it could borrow against that line of credit when it wanted to make an investment. Scott LaBonte made

4

decisions concerning the finances and movement of funds into and out of the SAL Dynasty Trust even though he was not a trustee.

On May 15, 2010, the Trustee commenced an adversary proceeding captioned James Berman, Chapter 7 Trustee for the Substantively Consolidated Estate of Michael S. Goldberg, LLC and Michael S. Goldberg v. Edward Malley, et al. (Adv. Pro. No. 10-02082) (the "Malley Adversary Proceeding").  In the Malley Adversary Proceeding, the Trustee sought to avoid and recover fraudulent transfers Malley received from the Goldberg Scheme. Malley was served with the complaint in the Malley Adversary Proceeding on May 21, 2010. Shortly after Malley was served with the complaint in the Malley Adversary Proceeding, Malley told Scott LaBonte that Malley had been sued by the Trustee.  When Malley told Scott LaBonte that he had been sued by the Trustee, Scott LaBonte understood that the purpose of the Trustee's lawsuit was to "claw-back" for the benefit of creditor-victims the money Malley had received from the Goldberg Scheme.

In June of 2010, shortly after he learned that the Trustee had sued Malley to recover the Goldberg Scheme transfers, Scott LaBonte transferred (the "SAL/DT Transfers") substantially all of his assets to the SAL Dynasty Trust. Scott LaBonte did not execute the documents effectuating the SAL/DT Transfers until sometime after July 16, 2010, but the transfer documents were made effective retroactively to June 2, 2010. The assets

transfered pursuant to the SAL/DT Transfers consisted primarily
of Scott LaBonte's ownership interests in various limited
liability companies, his interest in a limited partnership and
the stock of two closely held corporations. The transferred
assets were worth millions of dollars.

On or about June 2, 2010, Scott LaBonte met with
professionals at C&L.  C&L's privilege log reflects documents
and communications concerning C&L professionals giving estate
planning advice and advice concerning funding the SAL/DT
Transfers, starting in May of 2010 and continuing into 2014.

Charter Oak's privilege log likewise reflects documents and
communications, starting in June of 2010 and continuing through
June 2012, with Levy & Droney professionals concerning, among
other things, preparation of transactional documents to
effectuate the SAL/DT Transfers, as well as estate planning
advice.  The C&L and Charter Oak privilege logs also reflect
communications between the attorneys at those firms and
Sparveri, who was at CohnReznick.  The CohnReznick privilege log
reflects communications between Sparveri and the LaBontes'
counsel, as well as communications between Sparveri and Scott
LaBonte.  Both Scott and Sally LaBonte have testified that the
SAL/DT Transfers were effectuated based upon the advice of their
professionals.

In June 2010 Sally LaBonte and Scott LaBonte went on a trip to Italy with the individuals who had been named as guardians of their children. Sally LaBonte testified that in advance of the trip she was concerned about what would happen to their children in the event something happened to the LaBontes and the named guardians during that trip, and that this concern was the impetus for meeting with the lawyers at C&L in June of 2010 to discuss estate planning.

The Trustee commenced this adversary proceeding seeking (i) to avoid and recover fraudulent transfers made by Scott LaBonte to the SAL Dynasty Trust; (ii) a finding that Scott LaBonte so dominated and controlled the SAL Dynasty Trust that it and he are one and the same; and (iii) the avoidance and recovery of asset transfers by Scott LaBonte/the SAL Dynasty Trust to the named defendants.

The defendants have asserted the attorney-client privilege with respect to documents and communications with the Professional Firms.  The defendants filed the instant motions to quash subpoenas seeking such documents and communications and, in response, the Trustee seeks a ruling that: (i) the crime-fraud exception to the attorney-client privilege is applicable; (ii) the inclusion of third-parties in attorney-client communications when they were not necessary for the facilitation of legal advice resulted in a waiver of any privilege that might

otherwise be applicable; (iii) the LaBontes have waived the attorney-client privilege by placing the communications sought to be protected at issue in their own defense; and (iv) all responsive documents withheld on the basis of the attorney-client privilege, attorney work product or any other privilege, should be produced, without redaction, within 15 days of this court's order granting the Trustee's motion.

## II.  Discussion

As discussed below, the court concludes that the materials that have been withheld are discoverable under the crime-fraud exception to the attorney-client privilege. The record here contains evidence sufficient to establish probable cause to believe that a fraud was committed and that the communications at issue were in furtherance of that fraud, notwithstanding the explanations proffered by the defendants. Thus the court does not reach the issue of whether the inclusion of third-parties in attorney-client communications when they were not necessary for the communication for the facilitation of legal advice resulted in a waiver of the privilege, nor the issue of whether the LaBontes waived the attorney-client privilege by placing a communication sought to be protected at issue in their own defense.

The Connecticut Supreme Court has held:

>[T]he attorney-client privilege reflects a significant
>public policy, and . . . "[i]t is important not to
>weaken the privilege with various exceptions
>because . . . even the threat of disclosure would have
>a detrimental effect on attorneys' ability to advocate
>for their clients while preserving their ethical duty
>of confidentiality"; Metropolitan Life Ins. Co. v.
>Aetna Casualty & Surety Co., 249 Conn. at 48-49; we
>also have recognized "that since the [attorney-client]
>privilege has the effect of withholding relevant
>information from the factfinder, it applies only where
>necessary to achieve its purpose." Shew v. Freedom of
>Information Commission, 245 Conn. 149, 157 (1998).

Olson v. Accessory Controls & Equip. Corp., 254 Conn. 145, 170 (2000).  There is an "exception to the attorney-client privilege when the privileged communications are made with the intent to further a crime or civil fraud."  Id. at 172.

In Olson, the court adopted the standard for the crime-fraud exception set forth by the Second Circuit in United States v. Jacobs, 117 F.3d 82 (2d Cir. 1997), abrogated on other grounds, Loughrin v. United States, 134 S. Ct. 2384 (2014), as follows: "the crime-fraud exception permits abrogation of the attorney-client privilege solely upon a determination by the trial court that there is probable cause to believe that the privileged communications were made with the intent to perpetrate a civil fraud and that the communications were made in furtherance of that fraud."  Olson, 254 Conn. at 174. "[A] party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the

communications were in furtherance thereof." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (citing In re John Doe, 13 F.3d 633 at 637 (2d Cir. 1994)).

"Unless there is a purposeful nexus between the attorney-client communications and the perpetration of the alleged fraud, there is not a sufficient basis to invade the privilege." Cendant Corp. v. Shelton, 246 F.R.D. 401, 406 (D. Conn. 2007). "[T]he crime-fraud exception cannot be invoked simply because attorney-client communications have the potential to be relevant evidence in connection with a crime or fraud."  Id.

> [T]he "proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct."  Finally, in Cox v. Administrator United States Steel & Carnegie, 17 F.3d 1386, 1417 (11th Cir. 1994), the court stated that the crime-fraud exception should not provide a "reason to permit opponents of the privilege to engage in groundless fishing expeditions." Id. (quoting United States v. Zolin, 491 U.S. 554, 571 (1989)).

Id. at 407 (some internal citations omitted).

The crime-fraud exception applies "even if the attorney has no inkling that the matter he or she is working on involves any improper conduct." Amusement Industry, Inc. v. Stern, 293 F.R.D. 420, 440 (S.D.N.Y. 2013); see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, Nos. 08-01789 (SMB), 10-04216 (SMB), 2017 Bankr. LEXIS 519.

The court concludes that there is probable cause to believe that fraud has been committed by Scott LaBonte.

Under Connecticut General Statutes § 52-552e(a), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) [w]ith actual intent to hinder, delay or defraud any creditor of the debtor . . . ." Under Connecticut's Uniform Fraudulent Transfer Act ("CUFTA"), a creditor is defined as a person who has a "claim," Conn. Gen. Stat. § 52-552b(4), and a debtor is defined as "a person who is liable on a claim." Id. at (6). Moreover, a claim is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Id. at (3). The Trustee had a claim against Scott LaBonte when the Trustee was appointed in January 2010 and also on June 2, 2010, the effective date of the SAL/DT Transfers.

There is probable cause to believe that Scott LaBonte made the SAL/DT Transfers with actual intent to hinder, delay, or defraud the Trustee. Such probable cause is established by both direct and circumstantial evidence. When he testified on November 10, 2014, Scott LaBonte answered "Yes" in response to

11

the question: "At the time that you transferred your assets to the Dynasty Trust, effective June 2nd, 2010, you understood that one of the benefits of transferring the assets was to put them out of the reach of creditors, correct?" Trustee's Omnibus Mem. Supp. Mot. Compel and Opp. Mot. Quash Subpoenas Ex. A, at 17:23-18:1, ECF No. 42-1. In addition, Sparveri, who was one of the trustees of the SAL Dynasty Trust, also testified on November 10, 2014 that a purpose of the transfers to the SAL Dynasty Trust was to move Scott LaBonte's assets beyond the reach of his creditors.

There is also probable cause to believe that Scott LaBonte acted with actual intent to hinder, delay, or defraud the Trustee based on evidence as to the presence of at least two of the "badges of fraud" that are enumerated in Connecticut General Statutes § 52-552e(b):

> In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: . . . (2) the debtor retained possession or control of the property transferred after the transfer . . . (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit . . . .

Conn. Gen. Stat. § 52-522e(b).

As to factor (2), the effective date of the SAL/DT Transfers was June 2, 2010. The SAL Dynasty Trust had established an investment account with LPL Financial by no later than April 30, 2010. The transfered assets periodically

12

generated income, but notwithstanding the fact that the SAL Dynasty Trust had its own account with LPL Financial, during the period from June 2, 2010 through January 2011 Scott LaBonte directed that those funds be deposited into his personal checking account at Bank of America. Scott LaBonte was not a trustee of the SAL Dynasty Trust, and thus had no lawful authority to direct where the funds were deposited. Scott LaBonte ceased having funds deposited into his personal checking account only after he was added as a defendant in the Malley Adversary Proceeding. In addition, there were check writing privileges for the SAL Dynasty Trust's account with LPL Financial. With the exception of five or six checks signed by Sparveri, Sally LaBonte signed all the checks written on the account. However, the checks were personally written by Scott LaBonte, and Sally LaBonte did not make any decisions about the payment of the income generated by the assets that had been transferred to the SAL Dynasty Trust.

As to factor (4), shortly after Malley was sued in the Malley Adversary Proceeding, Malley told Scott LaBonte that he had been sued by the Trustee, and Scott LaBonte understood that the purpose of the Trustee's lawsuit was to "claw-back" for the benefit of creditor-victims money Malley had received from the Goldberg Scheme. The structure of Scott LaBonte's investments in the Goldberg Scheme evidenced his fraudulent intent, he knew or

suspected that he had been participating in an illegitimate enterprise, and he had received hundreds of thousands of dollars in fees in connection with that scheme. Thus there is probable cause to believe that Scott LaBonte was aware of the threat of suit prior to the effective date of the SAL/DT Transfers, June 2, 2010. In fact, the transfers were not effectuated until July of 2010 with an effective date of June 2, 2010.

In addition, there is probable cause to believe the explanation proffered by Sally LaBonte for the timing of the SAL/DT Transfers is pretextual. Sally LaBonte testified that assets were transferred to the SAL Dynasty Trust effective June 2, 2010 because she had concerns about estate planning because she and Scott LaBonte were travelling to Italy with the individuals who had been named as guardians of their children, and she was concerned about what would happen to their children in the event something tragic happened to the LaBontes and the named guardians during that trip. Sally LaBonte testified that everything had to be done before they left on that trip, and that she wanted everything finalized because she was nervous about them all traveling together. However, that trip took place between June 15, 2010 and June 28, 2010 and the documentation was not completed until after that trip and it was then backdated to June 2, 2010.

The court also concludes that there is probable cause to
believe that the documents and communications at issue here were
in furtherance of a transfer of assets made by Scott LaBonte
with actual fraudulent intent. Both Scott and Sally LaBonte have
testified that the SAL/DT Transfers were effectuated based upon
the advice of their professionals. But, although Scott LaBonte
testified that "it's a 'standard estate practice' that we
started in 2006 and continued on in 2010," Trustee's Omnibus
Mem. Ex. A, ECF. No. 42-1 at 33:9-13, there were no transfers in
the nature of the SAL/DT Transfers until after Scott LaBonte
became aware that the Trustee was seeking to "claw-back" from
Malley money Malley had received from the Golberg Scheme. Also,
the LaBontes had been advised by their attorney by letter dated
January 27, 2006 that they "should consider transferring only a
portion of each deal into the Dynasty Trust so that if the asset
appreciates in value, you will continue to personally own a
portion of the investment." Reply in Further Supp. Trustee's
Omnibus Mem. Ex. C, ECF No. 55-3 at 3. But, that is not what
Scott LaBonte did. Rather he transferred substantially all of
his assets to the SAL Dynasty Trust. Finally, Scott LaBonte had
used the services of legal and accounting professionals in
structuring his own investments in the Goldberg Scheme, and
using their services in effectuating a fraudulent transfer of

assets would be consistent with the approach he took to structuring his investments in the Goldberg Scheme.

Based on the foregoing, the court concludes that the Trustee has satisfied the requirements for invoking the crime-fraud exception.

### III. Conclusion

For the reasons set forth above, The Trustee's Motion to Compel Charter Oak Law, P.C., Cummings & Lockwood LLC, and CohnReznick LLP's Compliance with Subpoenas (Doc. No. 41) is hereby GRANTED and the following motions to quash are hereby DENIED: Defendants' Motion to Quash Plaintiff's Subpoena Duces Tecum Served upon Nonparty Cummings and Lockwood, LLC (Doc. No. 35); Defendants' Motion to Quash Plaintiff's Subpoena Duces Tecum Served upon Nonparties Levy & Droney, P.C. and Charter Oak Law, P.C. (Doc. No. 36); Defendants' Motion to Quash Plaintiff's Subpoena Duces Tecum Served Upon Nonparty CohnReznick, LLP (Doc. No. 37); Motion to Quash of Nonparty Charter Oak Law, P.C. f/k/a Levy & Droney, P.C. (Doc. No. 39).

All responsive documents withheld on the basis of the attorney-client privilege, attorney work product or any other privilege, shall be produced, without redaction, within 15 days of the date of this order.

It is so ordered.

16

        Signed this 20th day of September, 2018, at Hartford,

Connecticut.


                                    _____/s/ AWT_____
                                    Alvin W. Thompson
                                    United States District Judge